IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 15-cr-00529-CRB-1 |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION FOR A JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT, MOTION FOR A NEW TRIAL** |
| WING WO MA, | |
| Defendant. | |

Defendant Wing Wo Ma was convicted of (1) participating in a drug conspiracy, (2) using and carrying a firearm during and in relation to a drug trafficking crime, (3) use of a firearm during and in relation to a drug trafficking crime resulting in death, and (4) conspiracy to commit honest services fraud. He now moves for a judgment of acquittal or a new trial, arguing that the evidence in the case did not support the jury's verdict on any count. See Mot. (dkt. 229).

The only piece of evidence that Ma actually argues was lacking in the government's case was evidence of the "discharge of the firearm." Id. at 4. But the firearm is not relevant to either the first or the fourth counts. As to the second and third counts, the government demonstrated that Ma used a firearm, during and in relation to his marijuana grow operations, to kill the victims in this case—Jim Tat Kong and Cindy Chen. The evidence of Ma's guilt as to each count is sufficient, and a new trial is not warranted.

## I.    BACKGROUND

Ma was initially indicted in November 2015. See Indictment (dkt. 15). A superseding indictment followed in April 2017 (dkt. 88), a second superseding indictment followed in October 2018 (dkt. 140), and, finally, the Third Superseding Indictment followed that same month (dkt. 144). The grand jury charged Ma with violation of (1) 21 U.S.C. § 846 – Conspiracy to

1   Manufacture and Distribute and to Possess with Intent to Distribute Marijuana; (2) 18 U.S.C. §§

2   924(c)(1)(A) and 2 – Possession of Firearm in Furtherance of Drug Trafficking Crime and Use of

3   Firearm During and In Relation to Drug Trafficking Crime; (3) 18 U.S.C. §§ 924(j) and 2 – Use of

4   Firearm Resulting in Death; and (4) 18 U.S.C. §§ 371, 666, 1343, and 1346 – Conspiracy to

5   Commit Honest Services Fraud and Bribery.  Third Superseding Indictment.

6       Trial began on October 15, 2019.  <u>See</u> Jury Trial (dkt. 175).  It concluded on November 7,

7   2019, when the jury convicted Ma on all four counts.  Special Verdict Form (dkt. 216).[1]  He now

8   moves for a judgment of acquittal or, in the alternative, a new trial.  <u>See</u> Mot.  The government

9   opposes, <u>see</u> Opp'n (dkt. 230), and Ma has declined to file a reply.  The Court finds this motion

10  suitable for resolution without oral argument and therefore VACATES the motion hearing

11  currently set for June 10, 2020.  The Court will proceed with sentencing on that day.

12  **II.     LEGAL STANDARD**

13      **A.      Rule 29 Acquittal Standard**

14      Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion

15  must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a

16  conviction."  Fed. R. Crim. P. 29(a).  Evidence is insufficient to sustain a conviction if, viewing

17  the evidence in the light most favorable to the prosecution, a rational trier of fact could not have

18  found the essential elements of the crime beyond a reasonable doubt.  <u>United States v. Nevils</u>, 598

19  F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

20      **B.      Rule 33 New Trial Standard**

21      Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

22  court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R.

23  Crim. P. 33(a).  Unlike with Rule 29, "[t]he court is not obliged to view the evidence in the light

24  most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the

25  credibility of the witnesses."  <u>United States v. Kellington</u>, 217 F.3d 1084, 1097 (9th Cir. 2000).  If,

26  "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates

27

28  _____

[1] The Court was dark the week of October 28, 2019, so trial was just short of three weeks long.

United States District Court
Northern District of California

1   sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred,"

2   the court may set aside the verdict and grant a new trial.  Id. (citing United States v. Lincoln, 630

3   F.2d 1313, 1319 (8th Cir. 1980)).

4   **III.    DISCUSSION**

5          Ma argues that "the jury could only have found Mr. Ma guilty of these crimes by use of

6   conjecture and speculation, not facts."  Mot. at 4.  But he only identifies one way in which the

7   evidence was insufficient to support his convictions, arguing that there was no evidence that he

8   discharged a firearm.  Id.  As he argued during trial, Ma argues here that no witnesses testified that

9   they saw him discharge a firearm, there was no DNA on the bullet casings, there were no

10  fingerprints, and "[t]he only real piece of evidence tying Mr. Ma to the scene of the homicide were

11  cigarette butts."  Id.  Whether or not Ma discharged a firearm has no relevance to the first count

12  (marijuana conspiracy) or the fourth count (conspiracy to commit honest services fraud/bribery),

13  and on those counts there is ample evidence of Ma's guilt.  As to the second count (use and

14  carrying of a firearm in connection with drug trafficking) and the third count (use of a firearm

15  resulting in death), the government need not have produced an eyewitness to the murders or any of

16  the other evidence Ma highlights in order to prevail.  Ample evidence supported the convictions

17  on those counts.

18         This Order addresses each count, starting first with the non-firearm counts, and then

19  addressing the two counts that involve a firearm.

20  **A.     First Count: Conspiracy to Distribute or Possess With Intent to Distribute
             Marijuana**

21
          Numerous witnesses testified that Ma engaged in a series of failed business deals in which

22  frustrated investors were promised a stake in subsequent and more promising deals.  More than

23  one of these deals involved marijuana.  The evidence showed that the conspiracy began with Ma

24  soliciting investors in Mendocino County marijuana operations after his failed effort to build a

25  planned community in Mendocino.  Kevin Luu, Thinh Tran, Jeffrey Huynh, and Eric Zhen

26  testified about the Mendocino County marijuana operations.  For example, Huynh testified that

27  Ma hired him to build two marijuana greenhouses at Road D.  See Trial Tr. of 10/22/19 (dkt. 194)

28

United States District Court
Northern District of California

at 1102:7– 1103:8.  Zhen testified that Ma, Kong, and Chen were growing marijuana at Road D and that the plants had died and been replaced repeatedly.  See Trial Tr. of 10/17/19 (dkt. 184) at 571:18–573:14.  Luu testified that Ma told him he would roll over Luu's earlier, lost investment into an investment in the Road D marijuana grow.  See Trial Tr. of 10/21/19 (dkt. 193) at 814:6– 23.  Luu also testified that the Road D grow, which yielded over 100 plants, was a failure.  Id. at 822:9–14.  And he testified that Ma provided some of the plants.  Id. at 824:17–19; see also Trial Tr. of 10/15/2019 (dkt. 182) at 246: 20–25 (Chan testimony about Ma, Kong, and Chen being engaged in marijuana business at Road D).  Law enforcement testified that they found and seized 150 marijuana plants from the Road D property.  See, e.g., Trial Tr. of 10/18/19 (dkt. 185) at 743:7–11 (Wells testimony about greenhouses with marijuana plants); id. at 759:18–20 (150 plants between upper and lower grow).

Witnesses like Zhen and Luu also testified about Ma using misinformation to involve investors in the Road D marijuana operation, like Kong and Chen, in subsequent schemes.  See, e.g., Trial Tr. of 10/21/19 at 826:10–15 (Luu testimony re rolling over investment into new marijuana operation); Trial Tr. of 10/17/19 at 578:578:13–16 (Ma claimed he owned the land at the Bark Dumps).  When Road D failed, Ma owed money to Kong and solicited additional money.  He began claiming to be using the area of the Bark Dumps, an area off of Highway 20 near Fort Bragg, as the site of a new marijuana operation.  Trial Tr. of 10/21/19 at 827:7–9 (Luu testimony re Ma's talk of new operation in Mendocino with thousands of plants); id. at 828:21–829:6 (location of new marijuana operation in Fort Bragg near Surf Motel); Trial Tr. of 10/21/19 at 582:4–9 (Zhen testimony re Ma plan for Bark Dumps); id. at 584:21–585:24 (drilling holes for marijuana with Ma at Bark Dumps); Trial Tr. of 10/22/19 at 1108:10–12 (Ma discussing outdoor grow at Fort Bragg).

Viewing the evidence in the light most favorable to the prosecution, the government established Ma's involvement in a marijuana cultivation conspiracy involving 150 or more plants.  A rational jury could and did find Ma guilty on this count.  Moreover, weighing the evidence and the credibility of the witnesses, the interest of justice does not require a new trial on this count.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

**B.      Fourth Count: Conspiracy to Commit Honest Services Fraud**

The government's theory on the conspiracy to commit honest services fraud/bribery count was that Ma paid for things for former Oakland Police Department Lieutenant and Alameda County District Attorney Investigator Harry Hu, even though Hu, as a public official, could not accept such gifts.  Noelle Mah, who did clerical work for Ma, testified that Ma instructed her to purchase airline tickets to Las Vegas and to make hotel reservations there for Hu and his associates.  See Trial Tr. of 10/21/19 at 966:5–8 (booked flights for Hu with Ma's credit card).  Mah also testified that Ma remodeled Hu's house.  Id. at 989:24–990:2; 957:21–23 (no evidence Hu paid for remodel).  She also testified that Ma gave Hu a new Mercedes.  Id. at 956:10–25.  Luu and others testified that Ma hosted Hu at private room bars with female entertainment.  See, e.g., id. at 801:4–804:11; see also Trial Tr. of 10/24/2019 (dkt. 196) at 1537:16–1538:5) (Hu testified that Ma paid for Hu's flights, meals, drinks, tips, women at PR bars).

The government also introduced evidence of a quid pro quo in connection with these gifts.  For example, Mah testified that she reached out to Hu, asking for his help after Ma refused to pay her salary and stole an investment from her.  Trial Tr. of 10/21/2019 at 977:5–979:16.  Hu testified that he could have referred her complaint to the Oakland Police Department, that he was suspicious that Ma was ripping people off, but that he did not help her because he was essentially protecting Ma from both law enforcement and civilians.  Trial Tr. of 10/25/19 (dkt. 197) at 1650:22–1653:15.  The government also introduced evidence about an instance when one of Ma's marijuana grows, located at a fortune cookie factory, burned down.  Without acknowledging that Ma was a friend, Hu reached out to a younger officer and identified Ma as a source of information, rather than a target of the investigation—thus decreasing the risk that Ma would be investigated.  See Trial Tr. of 10/23/2019 (dkt. 195) at 1282:21–1283:3; id. at 1288:24–1289:11 (Hu did not provide him with information about Ma engaging in other fraudulent conduct).  Hu also testified that when Ma reached out to him about the fortune cookie marijuana grow, Hu suspected that Ma was involved in the grow.  Trial Tr. of 10/24/2019 at 1553:3–6.  But he informed the officer that Ma was a witness, not a suspect, which he knew would benefit Ma.  Id. at 1555:11–22.  Finally, after the homicides in this case, Ma met with Hu, feeling that he had to because he had received

United States District Court
Northern District of California

1    gifts from Ma.  Id. at 1569:21–1570:8.  Rather than report the meeting to law enforcement, Hu

2    called Mendocino County investigators, because he felt obligated to do so, but concealed the

3    meeting and the information Ma had provided—again distancing Ma from a criminal

4    investigation.  See id. at 1571:7–1572:7; see also Trial Tr. of 10/21/2019 at 804:5 (Luu testified

5    that Ma introduced him to Hu, saying that "[w]hen you get into a tough situation, he can help

6    out.").

7        Viewing the evidence in the light most favorable to the prosecution, the government

8    established Ma's involvement in a conspiracy to commit honest services fraud or bribery.  A

9    rational jury could and did find Ma guilty on this count.  Moreover, weighing the evidence and the

10    credibility of the witnesses, the interest of justice does not require a new trial on this count.

11      **C.**      **Second and Third Counts: Using and Carrying a Firearm During and In
Relation to a Drug Trafficking Crime; Use of a Firearm During and In**

12               **Relation to a Drug Trafficking Crime Resulting in Death**

13        The government also demonstrated that Ma possessed a firearm in furtherance of the

14    marijuana conspiracy in Count One, that he used and carried a firearm during and in relation to

15    that conspiracy, and that he used that firearm to murder the victims rather than admit to them that

16    the Bark Dumps marijuana grow was another lost investment.

17        The evidence at trial was that Ma solicited investments and rolled over debts into the

18    supposed Bark Dumps marijuana grow near Fort Bragg.  See, e.g., Trial Tr. of 10/21/2019 at

19    826:10–15 (Luu testified that Ma told him he would roll over investment in Road D into new

20    operation, and with profits from new operation, "he will pay me back what he owes me.").  Law

21    enforcement testified that there was no marijuana grow at the Bark Dumps.  See, e.g., Trial Tr. of

22    10/18/2019 at 755:8–13.  Zhen testified that he went on his own to the location Ma had described

23    for the marijuana operation, but that there was nothing there.  See Trial Tr. of 10/17/2019 at

24    596:3–598:20 (walked all around the sites and "we didn't see nothing").

25        On Sunday, October 13, 2013, according to Huynh, Luu and Zhen, Ma arranged for a

26    group of people to travel to Mendocino County, stay at the Surf Motel, inspect the marijuana

27    operation, and work on trimming and harvesting the marijuana.  In the days leading up to the

28    homicides, witnesses spent days waiting for Ma to show them the Bark Dumps marijuana grow,

but he would not take them there.  See, e.g., Trial Tr. of 10/21/2019 at 843:21–844:1 (everyone was supposed to see the marijuana Monday but "no one saw anything"); id. at 844:12–13 (Ma told everyone they couldn't see the marijuana); id. at 847:7 ("We waited but we never went."); Trial Tr. of 10/17/2019 at 607:8–14 (Zhen testimony that he spent the second day at Surf Motel just sitting in room; not taken to see grow site).  Kong, who had invested substantial sums in the grow, expressed increasing agitation at not having seen it.  Huynh testified that Kong seemed unhappy with Ma.  See Trial Tr. of 10/22/2019 at 1121:10–12.  Zhen told Kong that he had not seen the grow site at the Bark Dumps, and Kong was upset.  Trial Tr. of 10/17/2019 at 592:7–15 (Kong was mad, said it seemed like Ma was stalling and that Ma owed him about $100,000).  Luu testified that he observed Kong getting upset about not seeing the grow site.  See Trial Tr. of 10/21/2019 at 848:10–15.  Kong asked Luu if he had ever been to the site, seen any product, or done any trimming; Luu told him that he had not, asked Kong the same questions, and learned that Kong had also not seen the Bark Dumps operation.  Id. at 849:23–850:5.  Zhen testified that he witnessed a heated conversation between Ma and Kong.  Trial Tr. of 10/17/2019 at 610:19–611:15.  Kong told Luu that he had invested in both Road D and the new operation, and was owed about $300,000.  Trial Tr. of 10/21/2019 at 850:16–851:4.  Chen also expressed that she wanted to see the marijuana grow, and confronted Ma with the fact that Zhen had walked around and not seen anything.  Trial Tr. of 10/17/2019 at 605:11–606:15.  Several members of the group, including Huynh and Chen, left Mendocino.

Numerous witnesses testified that Kong had a temper and was not the kind of person who would have let Ma get away with swindling him.  See, e.g., Trial Tr. of 10/22/2019 at 1132:5–6 (Huynh re Kong's temper); Trial Tr. of 10/15/2019:247:19–248:8 (Chan testimony re Kong being "really easy to get angry with people," Kong involvement in criminal enterprises, Kong involvement in tong); Trial Tr. of 10/21/2019 at 1020:4–2021:19 (Ancajima testimony re Kong personality and involvement in criminal enterprises; if someone owed him money and wouldn't pay, "pretty sure he would get physical.").  A week or two before the murders, Ma had showed Luu and Huynh a semi-automatic firearm that he stated was for the purpose of protecting the marijuana operations.  See, e.g., id. at 831:10–832:25 (Luu testified that Ma showed him a gun,

1    said that they would begin trimming marijuana soon, said they needed guns for the marijuana

2    operations, asked Luu to get more guns); Trial Tr. of 10/22/2019 at 1109:8–1110:16 (Ma showed

3    gun to Luu and Huynh about a week before Fort Bragg trip, while discussing Fort Bragg

4    marijuana grow).

5         On Wednesday, October 16, 2013, Ma was supposed to show the Bark Dumps marijuana

6    grow to Kong.  Kong sent Chen a text message asking her to return to Mendocino so that she

7    could pick him up and they could return to the Bay Area to celebrate her birthday.  Trial Tr. of

8    11/4/2019 (dkt. 218) at 1848:3–1850:3.  Chen responded: "If Fat Man [a nickname for Ma[2]] plays

9    his game tomorrow, aren't you afraid?"  Id. at 1850:4–8.  Kong asked Chen to come back to Fort

10   Bragg to see the grow site.  Id. at 1850:11.

11        According to testimony and video surveillance shown at trial, on Wednesday, October 16,

12   2013, Ma, Kong, and Chen left their rooms at the Surf Motel and drove away, returning after they

13   visited a local bar and grill.  Kong then told Luu that Ma had taken them to the site but that there

14   was a gate that they could not get past, and it was dark, so he could not see anything.  Trial Tr. of

15   10/21/2019 at 856:20–857:2.  Ma later told Luu that when he took Kong to the site that same time,

16   they had seen all the plants—which Luu understood was a lie.  Id. at 858:12–21.

17        In the early morning of Thursday, October 17, 2013, Kong and Chen made a last effort to

18   see their investment at the Bark Dumps.  Video surveillance at the Surf Motel showed Ma leaving

19   the Surf Motel in a caravan with Chen's minivan, directly behind it with his truck's headlights on.

20   See Trial Tr. of 10/16/2019 (dkt. 183) at 421:19–424:24.  They left the Surf Motel at 5:48 A.M.,

21   before sunrise, and the trip to the Bark Dumps was no more than ten minutes.  Chen parked the

22   minivan at the Bark Dumps.  The evidence demonstrated that at some point Ma got into the

23   minivan's back seat, that Kong and Chen slept in the front seats (perhaps waiting for the sun to

24   rise so that they could inspect the grow), and that Ma shot them each once in the back of the head.

25   See, e.g., Trial Tr. of 10/15/2019 at 208:8–21 (Stefani testimony re condition of victims); id. at

26   212:2–16 (empty brass casing inside passenger door); id. at 278:14–20 (Rosenfeld testimony re

27

28   _____

     [2] See Trial Tr. of 10/15/2019 at 252:15–17.

United States District Court
Northern District of California

shooter's perspective); id. at 288:10–12 (bullet hole in back of hat); id. at 289:7–13 (injuries to female victim); Trial Tr. of 10/23/2019 at 1327:1–10 (Porter testimony that female victim had blanket over her, shoes off, "appeared she had been sitting there for some time, perhaps sleeping."). It appeared that Ma shot Kong first, which woke Chen for an instant, in time to raise her hand defensively, before his next shot went through her fingers and into the side of her head, striking an interior post of the minivan. The spent cartridges inside the minivan suggest that the firearm used was a semi-automatic that ejects cartridges upon firing, and that the door of the minivan was closed when the firearm ejected. See Trial Tr. of 10/18/2019 at 731:14–732:14 (Webb testimony re semi-automatic). The location of the wounds was consistent with the firearm being shot from the backseat. And while there was "shake" marijuana strewn about the back of the vehicle, superficially suggesting a robbery, there was a substantial amount of cash left in the minivan. See Trial Tr. of 10/15/2019 at 216:2–13 (Stefani testimony that marijuana shake appeared not to be stepped on); Trial Tr. of 10/23/2019 at 1328:2–14 (Porter testimony re money left in the minivan). Moreover, three cigarette butts were recovered at the scene of the homicides, next to the passenger side of the minivan, which contained Ma's DNA. See Trial Tr. of 10/15/2019 at 213:3–12 (cigarette butts); 275:19–281:16; Trial Tr. of 10/16/2019 at 338:6–353:14 (Ma's DNA on cigarette butts).

According to video surveillance, Ma returned to the Surf Motel and appeared in the lobby at about 7:52 A.M. See Trial Tr. of 10/16/2019 at 426:9–24. He went to Zhen and Luu's room, and asked if they had seen Kong and Chen. See Trial Tr. of 10/21/2019 at 864:25–865:4. After this interaction, Zhen and Luu repeatedly tried to call Kong. See, e.g., Trial Tr. of 10/17/2019 at 615:18–616:10. About an hour later, Ma called Luu from the road on his way back to the Bay Area. Ma told him that there had been a robbery, someone was shot, and that Luu and Zhen should pack up their things and leave. Trial Tr. of 10/21/2019 at 867:5–21. A few minutes later, Ma called Huynh and told him that something had happened and that Kong and Chen were dead. Trial Tr. of 10/22/2019 at 1123:20–1124:18. Cell phone records show that no one had called Ma that morning, meaning that he could only have learned of their deaths by being at the scene. Ma called the Surf Motel to check out of all the rooms he had booked, but he never called either of the

1    victims' phones.  See, e.g., Trial Tr. of 10/24/2019 at 1434:10–19 (Fitzgerald testimony re Kong

2    phone).

3         Ma was interviewed twice by law enforcement about the murders, and he lied repeatedly in

4    ways that incriminated him.  See, e.g., Trial Tr. of 10/25/2019 at 1681:20–1682:14 (Illia testimony

5    re inconsistent answer about last time he saw Kong); id. at 1683:9–1685:10 (Illia testimony re

6    shifting answers about following Kong from Surf Motel morning of homicides); id. at 1687:18–

7    1688:3, 1689:2–21, 1691:11–14 (Illia testimony re multiple contradictory answers about last time

8    Ma was at murder site); id. at 1688:18–23 (Illia testimony re answer about Ma simply dropping off

9    supplies); id. at 1690:17–1691:7 (Illia testimony about suspicious comments re cigarette

10   locations); id. at 1694:7–18 (Illia testimony re suspicious claim that Ma went directly back to

11   hotel).  He also repeatedly referred to the victims as garbage and said that he did not care about

12   them.  See id. at 1678:2–7 (Illia testimony re interview); id. at 1678:3–5 (Ma expressing that he

13   does not care who gets killed).

14        The government made a compelling closing argument and rebuttal, highlighting various

15   categories of evidence that support Ma's guilt.  The government showed that Ma had a clear

16   motive to kill Kong and Chen.  Consecutive investments the victims made with Ma had failed, and

17   their last investment with him, a marijuana grow near the Bark Dumps, did not exist.  Kong and

18   Chen insisted on seeing the marijuana grow, expressed frustration at not having seen it, and Ma

19   had no way to prevent his fraud from coming to light other than to murder them.  The government

20   demonstrated opportunity.  Ma followed Kong and Chen out of the Surf Motel at 5:48 on the

21   morning of their murders, and was the last known person to see them alive.  Kong and Chen

22   trusted the murderer enough to let him sit in the back seat of their minivan while they slept.  And

23   no one but Ma could have been present to show the victims a marijuana grow that he had

24   fabricated.

25        The government also highlighted the physical and forensic evidence: Ma's DNA on the

26   three cigarette butts at the location of the murder, the location of the gunshot wounds and shell

27   casings, the marijuana strewn around the van in an attempt to disguise the murders as a robbery,

28   and the cash left in the minivan, which is inconsistent with a robbery.  The government pointed to

1   video evidence of Ma and the victims traveling together the morning of the murder.  It pointed to

2   phone records and cellular telephone location data showing that Ma had no incoming calls to his

3   phone on October 17 until he called Luu, that Ma was already an hour away from Fort Bragg by

4   the time he told Luu that there had been a robbery and told Huynh that the victims were dead.  It

5   highlighted the victims' text messages, demonstrating that the plan for the morning of the murders

6   was for Ma to show them the marijuana operation, and that Chen was "afraid" of what Ma, backed

7   into a corner, would do.  The government pointed out Ma's many inconsistent statements in his

8   interviews with law enforcement, and his suggestions that law enforcement investigate other

9   suspects.

10          Viewing the evidence in the light most favorable to the prosecution, the government

11   established that Ma used and carried a firearm during and in relation to the marijuana cultivation

12   conspiracy, and that he used a firearm during and in relation to the marijuana cultivation

13   conspiracy, resulting in the victims' deaths.  A rational jury could and did find Ma guilty on these

14   counts.  Moreover, weighing the evidence and the credibility of the witnesses, the interest of

15   justice does not require a new trial on these counts.

16   IV.    **CONCLUSION**

17          For the foregoing reasons, the Court DENIES Ma's motion.

18          **IT IS SO ORDERED.**

19          Dated: April 21, 2020

20                                                      CHARLES R. BREYER
                                                        United States District Judge

21

22

23

24

25

26

27

28